# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

TOWANDA JEFFERSON,

                    Plaintiff,

          v.                                                    Case No. 09-CV-953

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

_____

## ORDER

Plaintiff Towanda Jefferson ("Jefferson") filed this action for judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits. Jefferson claims disability arising from back pain, headaches, right shoulder pain, fibromyalgia, irritable bowel syndrome, somatoform disorder, and anxiety disorder. Based on the reasoning set forth below, the court concludes that the Commissioner's decision is not supported by substantial evidence and remands the case for further proceedings.

## BACKGROUND

### I.    Procedural Background

Jefferson filed for Supplemental Security Income benefits under Title XVI of the Social Security Act on August 18, 2006. (Tr. 93). Her application was denied and Jefferson's appeal lead to a hearing before Administrative Law Judge (ALJ) Alan Paez on May 14, 2009. (Tr. 21). The ALJ issued a written decision on June 30, 2009, finding that Jefferson is not disabled because a significant number of jobs

exist that she can perform. (Tr. 10-18). The Appeals Council denied review and Jefferson filed suit in this court on October 2, 2009. (Tr. 1-3).

## II.    Factual Background and Hearing Testimony

### a.    Testimony from Jefferson

Jefferson was 25 years old at the time of her hearing before the ALJ. (Tr. 93). Though she left school after ninth grade, Jefferson testified that she was completing work to attain her General Equivalency Degree. (Tr. 24). Jefferson and her two children live with Jefferson's grandmother and survive on W-2, food stamps, and the sporadic child support she receives. (Tr. 26). Jefferson has limited work experience consisting of part-time, minimum wage employment in a fast food restaurant and a grocery store. (Tr. 27).

Jefferson also provided testimony regarding her daily activities. She testified to spending several hours in the bathroom each morning due to her irritable bowel syndrome. When she feels recovered, Jefferson takes care of her two young children before they leave for school. She then spends many weekday mornings homeschooling for her GED classes. (Tr. 24). Jefferson makes simple meals for her children but is not responsible for many household chores other than washing dishes or making her bed. (Tr. 33-34). She attends church on a weekly or bi-weekly basis, watches movies, and helps her children with homework. (Tr. 34). Jefferson also participates in a domestic violence program because she has been the victim of such violence in the past. (Tr. 28, 33).

Case 2:09-cv-00953-JPS   Filed 08/03/10   Page 2 of 22   Document 21

Jefferson provided additional testimony regarding her physical ailments. Jefferson suffered a fractured coccyx and experiences residual lower back pain. (Tr. 28). She reports difficulty sitting for more than ten minutes and must move around or walk to ease numbness in her back. Jefferson also experiences painful, daily headaches and takes Tylenol 4 and Imitrex to address the problem. Jefferson's medications provide only a few hours of relief and she receives an Imitrex shot when oral medications prove ineffective. (Tr. 34). Jefferson can only walk a block and a half or two blocks before she must stop and standing is only possible for five minutes at a time. (Tr. 35-36). Jefferson sees her primary physician regarding her irritable bowel syndrome and also sees a pain management specialist. (Tr. 31). She reports taking a variety of medications, including: Methocarbamol as a muscle relaxer, Tizanidine and Diphengydramine for sleep, Dicyclomine and Omeprazole for her stomach, and Lyrica for her fibromyalgia. (Tr. 29-30).

### b. Testimony from the Vocation Expert

Vocational Expert Ronald Raketty ("Raketty) testified at Jefferson's hearing before the ALJ and provided information about Jefferson's previous employment and about jobs available in the State of Wisconsin to someone with Jefferson's particular limitations. (Tr. 37-40). The ALJ presented Raketty with a hypothetical individual who suffers certain limitations and asked him questions regarding the type of work such an individual could perform. The ALJ proposed a hypothetical individual of Jefferson's age, education and work experience limited to frequent stooping,

crouching and crawling, who could perform only simple, routine, repetitive tasks in a low stress job, defined as requiring only occasional decision-making and occasional changes in the work setting. (Tr. 38). Raketty testified that significant numbers of jobs exist that such an individual could perform and he identified the jobs of housekeeper (33,800 jobs), security monitor (1,500 jobs), and information clerk (1,880 jobs). (Tr. 39). The ALJ also asked Raketty whether jobs existed for an individual who, in addition to the aforementioned limitations, was also off task 20 percent of the day due to irritable bowels. Raketty testified that an individual with this limitation could not maintain full-time employment. (Tr. 39-40).

## III.    Medical Evidence of Record

Jefferson's relevant medical record begins on February 26, 2005, when she was diagnosed with a fractured coccyx resulting from domestic abuse. (Tr. 225, 326). Around that time, Jefferson also appeared for an office visit with her primary care physician, Dr. Francisca Olmedo-Estrada, and complained of decreased range of motion in her right shoulder and pain in her right arm. She was diagnosed with a right shoulder strain and referred for physical therapy. (Tr. 240). Jefferson completed seven physical therapy sessions over the next month but reported continuing difficulties with strength, and reaching above shoulder level. (Tr. 499). Jefferson returned to see Dr. Estrada in September because of her back pain. Dr. Estrada noted that she was "unsure" why Jefferson continued to have back pain and

stated: "I do believe that there is definitely a depressive component to this." (Tr. 205).

Jefferson was given a psychological evaluation by Dr. Kenneth Sherry, Ph.D., in December 2005. Jefferson reported to Dr. Sherry that she was applying for disability because of back pain and inability to raise her right arm. (Tr. 249). Dr. Sherry diagnosed Jefferson with a mild anxiety disorder and stated that Jefferson "seems to be overwhelmed by being a single mother." (Tr. 252). He also determined that Jefferson had the ability to understand, remember, and carry out simple to moderate complexity instructions and concluded that employment would be beneficial to Jefferson's mental health. (Tr. 253).

Jefferson went to an office visit in January 2006 and reported daily headaches, upset stomach from medications, bowel issues, and inability to gain weight. (Tr. 190). Jefferson was then referred to a neurologist, Dr. Rizwanullah Arain. She saw Dr. Arain in May 2006 and complained of lower back pain and headaches. (Tr. 235). Dr. Arain found myofascial pain syndrome along Jefferson's spine in the cervical, thoracic and lumbar region. (Tr. 235-36). Jefferson's follow-up appointment revealed chronic tension migraine headaches with underlying cervical strain and myofascial pain. (Tr. 231-34). Dr. Arain prescribed Elavil and Fioricet, though he substituted Pamelor for Elavil soon afterwards due to unpleasant side effects. (Tr. 183-85).

Jefferson went to the emergency room on June 4, 2006, complaining of a severe headache that would not ease. (Tr. 316-20). She returned two days later

and reported headache, nausea, abdominal pain and repeated vomiting. An abdominal examination revealed no evidence of bowel dilatation or free air. (Tr. 310-14). Jefferson also received a CT scan the following day which resulted in an "unremarkable study." (Tr. 182).

Jefferson returned to see Dr. Arain over the next several months and he made repeated adjustments to her medications. Jefferson continued to have chronic tension migraine headaches with underlying cervical strain and myofascial pain, as well as thoracic and lumbar strain and myofascial pain. (Tr. 178-181, 375). Dr. Arain sent Jefferson for physical therapy in August 2006, however, it provided only temporary relief and he considered giving Jefferson trigger point injections. (Tr. 178, 375).

On October 25, 2006, Dr. Jeffrey Polczinski, Psy. D., conducted a mental status evaluation for the State Agency. Jefferson reported to Dr. Polczinski that she was unable to work and when she attempted to do so, she would get dizzy, hot, and fall down. Dr. Polczinski noted that "there does appear to be some issues with compliance of medication treatment." Jefferson denied having depression but also complained that she was sad "all the time." In his assessment, Dr. Polczinski noted that Jefferson appeared to have multiple physical complaints involving multiple systems, but that "current records do not suggest medical substantiation of all of her difficulties." Dr. Polczinski diagnosed Jefferson with somatoform disorder but stated that she could understand simple directions, had adequate memory, attention, and

-6-

concentration for routine tasks, and could relate appropriately to co-workers and supervisors. He also noted that Jefferson had a poor ability to manage stress and/or change and assigned her a Global Assessment of Functioning[1] (GAF) score of 52. (Tr. 330-336).

On November 12, 2006, Dr. Mohammad Fareed, M.D., conducted an independent medical examination of Jefferson on behalf of the Social Security Administration. He noted that Jefferson's chief complaints were headache for six months and pain at trigger points. Dr. Fareed wrongly noted that Jefferson had sustained injury to her coccyx but had not suffered a fracture. His physical examination found that Jefferson appeared comfortable and without distress and that her extremities showed a full range of movements. An examination of Jefferson's spine revealed a spasm of the paraspinal muscles with tenderness in the lumbosacral area. Dr. Fareed's impressions included headache, myofacial pain syndrome, hematoma of the left chest wall, coccyx pain, and lower back pain. (Tr. 337-39).

On November 22, 2006, Dr. Mina Khorsidi, M.D., completed a Physical Residual Functional Capacity Assessment after reviewing Jefferson's record. Dr. Khorsidi determined that Jefferson could occasionally lift and carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for 6 hours and sit for 6 hours of an

---

[1]The Global Assessment of Functioning (GAF) is a scale for reporting a clinician's judgment of an individual's overall level of functioning. A score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupation, or school functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision 2000).

-7-

8-hour workday, and that she had an unlimited ability to push or pull. The Assessment did not include any other limitations. (Tr. 340-48).

Dr. Frances Culbertson, Ph.D., completed a Psychiatric Review Technique for Jefferson on November 27, 2006. He noted anxiety-related disorders and somatoform disorders. Dr. Culbertson found Jefferson to have mild limitation in her activities of daily living and maintaining social functioning. He also found Jefferson to have moderate limitation in maintaining concentration, persistence, or pace and found she had not experienced any episodes of decompensation. (Tr. 348-60). Dr. Culbertson completed a Mental Residual Functional Capacity Assessment in which he found Jefferson to be "moderately limited" in seven of the twenty categories of mental ability evaluated. (Tr. 362-64).

Jefferson continued her regular followup appointments with Dr. Arain during this period. In November and December 2006, Jefferson had normal neurological examinations, but Dr. Arain found trigger points in her neck and shoulder and adjusted her medications. (Tr. 371-72). Jefferson's visits on February 27, 2007, and March 29, 2007, resulted in assessments of lumbago, common migraine with intractable migraine, cervicalgia, and noncompliance with medical treatment. (Tr. 394-95). Dr. Arain noted that Jefferson's headaches had not responded to the multiple medications he tried, but that "noncompliance remains an issue as well." He further stated: "she needs psychiatric evaluation and treatment before I can do anything further in terms of her headaches." (Tr. 396).

-8-

Jefferson began seeing pain management specialist Dr. Nosheen Hasan, M.D., in May 2007. Jefferson saw Dr. Hasan almost monthly for the next year and a half. (Tr. 460, 462-70, 475-494, 515, 517, 519, 521-22, 529-30). Notes from Jefferson's September and October 2007 visits indicate that her headaches were less severe and that her condition improved on medications, but also noted Jefferson's fibromyalgia. (Tr. 481-83).

Dr. Hasan referred Jefferson for a Functional Capacity Evaluation on October 30, 2007, and the Performance Center at Wheaton Franciscan Healthcare generated a Physical Work Performance Evaluation report based on three and one-half hours of testing. (Tr. 505-514). The report found that Jefferson had dysfunction in major areas spanning all aspects of the test and identified the factors limiting her performance as decreased muscle strength in her extremities, de-conditioning, low back pain, generalized fatigue and muscle tremors. The report concluded that Jefferson had the functional capacity to perform work at the sedentary level. (Tr. 509).

Jefferson visited the emergency room on December 22, 2007, complaining of a day-long headache. She was diagnosed with cephalgia and vomiting and received IV hydration and morphine. (Tr. 453-54). Jefferson reported to the emergency room again on May 27, 2008, complaining of migraine headaches with nausea, emesis, and light sensitivity. She was given IV hydration and Toradol and received a diagnosis of migraine cephalgia with vomiting. (Tr. 447-48).

-9-

On November 13, 2008, Sarah Luft, a Physician's Assistant, completed a Medical Examination and Capacity form on Jefferson's behalf. Ms. Luft stated that Jefferson suffered from headaches, low back pain secondary to facet arthropathy, chronic pain syndrome and chronic aural headaches, but noted that no psychological conditions were present. She also stated that Jefferson had the ability to lift and carry ten pounds on an occasional basis, five pounds on a frequent basis, and to stand, walk and sit for at least two hours during an eight-hour workday. Ms. Luft indicated that Jefferson could maintain moderate physical exertion but was likely to be absent from work more than four days per month and required the ability to alternate positions frequently and maintain a flexible work schedule. Finally, Ms. Luft concluded that Jefferson could only work two hours per day for three days per week. (Tr. 501-04).

Ms. Luft completed a second Medical Examination and Capacity form on February 18, 2009. Though she had previously noted Jefferson's need to alternate positions and maintain a flexible work schedule, Ms. Luft now revised her assessment and found that Jefferson did not need accommodations. Ms. Luft also revised her assessments of Jefferson's ability to stand, walk, and sit to three to four hours during an eight-hour workday. Finally, she concluded that Jefferson could work three to four hours per day for three days per week. (Tr. 532-35).

-10-

## ANALYSIS

The Social Security Act provides that a district court may affirm, modify, or reverse the decision of the Commissioner of Social Security and may also remand the cause for a rehearing. 42 U.S.C. § 405(g). The statute also states that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the Commissioner's decision is deferential, however, "it is not abject." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The court will not uphold an agency decision that contains legal error, lacks evidentiary support, or is so poorly articulated that the court cannot conduct meaningful review. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Similarly, a court cannot uphold a decision that fails to mention pertinent evidence or fails to build a logical bridge between the facts and the outcome. *Parker,* 597 F.3d at 921.

Jefferson asks the court to reverse the Commissioner's unfavorable decision and to remand her claim for further administrative proceedings. She argues that the ALJ committed legal error in rendering his Residual Functional Capacity finding and credibility determination. Jefferson further asserts that the ALJ failed to resolve conflicts between the testimony of the Vocational Expert and the Dictionary of Occupation Titles, contrary to the requirements of Social Security Ruling 00-4p. The court agrees that the opinion involved error and will remand the case.

-11-

## I.    Residual Functional Capacity

Jefferson initially argues that the Residual Functional Capacity (RFC) finding made by the ALJ is legally and factually erroneous. An RFC finding represents the maximum that a claimant is still capable of despite her mental and physical limitations. *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). In determining the RFC, an ALJ relies upon testimony and medical evidence in the record and must determine what weight to give to the opinions of medical treaters and explain his reasons for doing so. *Id.* at 676. The ALJ must evaluate all limitations that arise from medically determinable impairments, even if they are not severe, and cannot simply dismiss a line of evidence contrary to the ruling. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing SSR 96-8p; *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)).

Here, the ALJ determined that Jefferson had the RFC to perform medium level work that requires no more than frequent stooping, crouching, kneeling, and crawling, that is limited to simple, routine and repetitive tasks, and is low stress. The requirement of "low stress" means that the work requires only occasional decision making and changes in the work setting. (Tr. 17). In arriving at his conclusion, the ALJ assigned "great weight" to the opinions of Dr. Polczinski and Dr. Fareed. (Tr. 16). However, the ALJ did not give significant weight to the findings in the Physical Work Performance Evaluation, including the conclusion that Jefferson could only perform sedentary work, because the ALJ felt that the evaluation's findings did not

-12-

"correspond with" objective evidence in the record or with Jefferson's daily activities. (Tr. 16). The ALJ's statement is problematic, however, because it does not explain how or why the evaluation contradicted the medical evidence. An unsupported assertion cannot establish the required logical bridge between the evidence and the conclusion. This is particularly true because the Physical Work Performance Evaluation involved extensive testing of Jefferson's specific physical abilities and appears highly relevant to an RFC assessment.

The ALJ further fails to explain how the evaluation conflicts with Jefferson's daily activities. Does the ALJ believe that attending church is inconsistent with a finding that Jefferson can only perform sedentary work? Does the ALJ believe that her ability to cook simple meals for her children is inconsistent with a finding that she can only perform sedentary work? The ALJ provides no insight into his reasoning process. An explanation is necessary because the ability to perform some minimal activities of daily living is not determinative in an evaluation of disability. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Therefore, the ALJ erred by failing to explain his decision to discount the Physical Work Performance Evaluation and its conclusions.

In addition, Jefferson argues that the RFC determination does not properly account for her mental limitations. Jefferson notes that the ALJ fails to assign a particular weight to, or account for, the conclusions of Dr. Culbertson. Dr. Culbertson determined that Jefferson had moderate difficulties in maintaining

Case 2:09-cv-00953-JPS    Filed 08/03/10    Page 13 of 22    Document 21

concentration, persistence or pace, that Jefferson was moderately limited in her ability to understand and remember instructions and maintain attention for extended periods, and that she was moderately limited in her ability to get along with coworkers or appropriately respond to criticism from supervisors. (Tr. 358, 362). Dr. Culbertson further found Jefferson to be moderately limited in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms. (Tr. 363). The ALJ may have taken note of these moderate limitations in rendering an RFC, but then again, he may not have. He does not refer to Dr. Culbertson's conclusions or assign any particular weight to them and the court cannot simply infer that they were considered in rendering the RFC determination. The Commissioner does not directly respond to Jefferson's argument, but suggests that the ALJ's failure to account for Dr. Culbertson's conclusions is immaterial because Dr. Culbertson relied upon *Dr. Polczinski's* examination in determining Jefferson's limitations and Dr. Polczinski's opinion *was* explicitly considered. However, the ALJ did not state that he omitted reference to Dr. Culbertson's conclusions because they relied upon Dr. Polczinski's examination or that he had already accounted for the conclusions because they relied upon Dr. Polczinski's examination. The court cannot attribute reasoning to the ALJ that is not included in the opinion. Further, the court cannot rely upon a rationale advanced only after-the-fact by the agency. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). Therefore, the court is unable to find that the ALJ properly considered, or

considered in any respect, the medical evidence and conclusions of Dr. Culbertson. The ALJ's disregard of evidence undermines the legitimacy of his ultimate conclusion.

Jefferson also asserts that limiting her to simple, routine, repetitive tasks in a low stress environment does not account for her limited ability to complete full-time work. This court agrees. The primary concern of the social security disability benefits program is the ability to engage in full-time gainful employment. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). Thus, limitations on full-time employment appearing in the medical record should be addressed. Here, the ALJ fails to acknowledge evidence that Jefferson cannot sustain a forty-hour work schedule. This evidence appears in a number of places in the record, including Dr. Culbertson's Mental Residual Functional Capacity Assessment, Ms. Luft's Medical Examination and Capacity conclusions (though the ALJ discounts Ms. Luft's opinions because she is a Physician's Assistant), and in Wheaton Franciscan's Physical Work Performance Evaluation. However, the ALJ wholly discounts these conclusions without specifically addressing Jefferson's capacity to work forty hours per week. For the reasons noted above, the court finds that the ALJ's determination of Jefferson's RFC determination is not supported by substantial evidence.

## II.    Credibility Determination

Jefferson also challenges the ALJ's determination that the limitations and symptoms she claims "cannot be found entirely credible." (Tr. 15). The court must

-15-

give special deference to an ALJ's credibility determinations unless they are "patently wrong." *Diaz v Chater*, 55 F.3d 300, 308 (7th Cir. 1995). However, an ALJ's decision may be reversed when it is "unreliable because of serious mistakes or omissions." *Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996). This type of error arises when the ALJ bases a credibility determination on serious flaws in reasoning and not merely on the witness's demeanor. *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004).

The ALJ dismisses Jefferson's testimony regarding the debilitating nature of her symptoms as inconsistent with the record evidence but does not adequately articulate his reasoning. The ALJ primarily relies upon his conclusion that Jefferson's subjective symptoms are at odds with her ability to take care of her two children, complete work towards earning her GED, and engage in limited housework. However, the ALJ does not explain how these activities, which can be done sporadically between migraines and time in the restroom, are inconsistent with her alleged symptoms. The ALJ also fails to explain how the activities show that Jefferson is able to work forty hours with standard breaks and regular attendance, despite her claimed limitations. Indeed, there is a difference "between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).

-16-

The ALJ also wrongly dismissed Jefferson's claims regarding daily flare-ups of her irritable bowel syndrome based on his prediction that current treatment would improve Jefferson's condition. The ALJ acknowledges that record evidence of Jefferson's irritable bowel syndrome exists. However, he proceeds to conclude that Jefferson's symptoms do not appear to be of long-term duration, "as she is now receiving medication which is expected to improve her symptoms and she is currently scheduled for a follow up appointment regarding this condition." (Tr. 16). The ALJ is not a medical professional and is not qualified to speculate that a claimant's current condition will improve based on a particular course of treatment. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJ's must not succumb to the temptation to play doctor and make their own medical findings."). The ALJ may not rely upon his own prediction that Jefferson's symptoms will be ameliorated by a new course of treatment when evaluating her credibility. Jefferson claims that she spends several hours in the bathroom each day as the result of her irritable bowel syndrome. Setting aside the ALJ's unqualified conclusion that current treatment will remedy her symptoms, Jefferson's testimony suggests that she will be off task for a significant portion of every workday. The Vocational Expert testified that an individual who is off task for 20% of each day because of bowel problems cannot sustain competitive work. (Tr. 39-40). The ALJ fails to address this testimony and his prediction that current treatment will be effective constitutes a mistake of reasoning undermining his credibility determination.

-17-

The ALJ provides only one other justification for determining that Jefferson's claimed symptoms are incredible. He discounts her claims of back pain because during the administrative hearing she "gave no signs of being in such significant pain (e.g. no facial contortions, no vocalizations, and no difficulty getting into or out of her chair), was able to focus on the question posed to her, and sat for the entire hearing." (Tr. 16). The ALJ did admit, however, that Jefferson complained about being in pain and shifted in her chair towards the end of the hearing. The court defers to the ALJ's determinations premised upon his personal observations of a claimant because the ALJ sees and interacts with the claimant and the court does not. However, in the instant case, the ALJ did not find that Jefferson's claims of pain were incredible because she sat through an entire hearing without exhibiting or complaining about pain. Instead, he found that Jefferson's symptoms were incredible because she did not complain "enough" about experiencing pain. This basis provides weak support for dismissing Jefferson's complaints when compared against the repeated notations of pain in Jefferson's medical records, her multitude of prescription medications, and her referral and long-term treatment by a pain management specialist. The court finds that the ALJ's credibility determination suffers from serious flaws in reasoning that must be redressed upon remand.

## III.    Compliance with SSR 00-4p

Finally, Jefferson alleges that the ALJ erred by failing to rectify conflicts between the Vocational Expert's testimony at the hearing and the Dictionary of

Case 2:09-cv-00953-JPS   Filed 08/03/10   Page 18 of 22   Document 21

Occupational Titles (DOT).  The veracity of the Vocational Expert's testimony is important here because the ALJ relied upon the testimony in determining that Jefferson is not disabled because jobs exist in significant numbers which she can perform.  In his opinion, the ALJ cited the Vocational Expert's testimony that an individual with Jefferson's limitations could perform unskilled, light work as a housekeeper, or unskilled, sedentary work as a security monitor and information clerk. (Tr. 18).  Jefferson argues that reliance upon this testimony constitutes error because the testimony does not comply with the DOT.

Social Security Ruling 00-4p requires the ALJ to ask a vocational expert whether his testimony conflicts with the DOT, and then elicit a reasonable explanation for any such discrepancy. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).  The ALJ has an affirmative duty to make this inquiry before relying on the expert's evidence to support a disability determination or decision. *Id.*  The ALJ made the required inquiry in this case and the Vocational Expert affirmed that his testimony was consistent with the DOT. (Tr. 40).  Jefferson asserts, however, that the Vocational Expert was incorrect and that his testimony did not comply with the DOT.  She identifies two errors in the Vocational Expert's testimony.  First, the Vocational Expert wrongly testified that housekeeper jobs exist at the sedentary level when they do not.  Second, the Vocational Expert wrongly identified a job listing for "security monitor," a position which does not exist within the DOT.  Jefferson argues that this testimony demonstrates discrepancies between the Vocational Expert's

-19-

testimony and the DOT and that the ALJ had an affirmative duty to obtain an explanation for the discrepancy.

The court finds that remand is necessary because the ALJ relies upon inaccurate Vocational Expert testimony and upon an inaccurate representation of the testimony. Thus, the ALJ's conclusion that a significant number of jobs exist which Jefferson can perform is not supported by substantial evidence. The Vocational Expert testified that an individual with the presented limitations could perform the job of housekeeper "which is light," but then went on to state that there are "33,800 of those [jobs] in existence at the sedentary level." (Tr. 39). The ALJ did not elicit an explanation for the inconsistent information provided by the Vocational Expert. Instead, the ALJ stated in his opinion that significant jobs exist in the economy that Jefferson can do and cites the 33,800 housekeeper jobs which he depicts as "light" work. (Tr. 18). The Vocational Expert did not testify that 33,800 housekeeper jobs exist at the "light" level, he testified that 33,800 housekeeper jobs exist at the "sedentary" level. The Vocational Expert may simply have misstated the nature of the work, however, the court cannot be sure because the ALJ made no attempt to clarify. Consequently, the ALJ's determination relies upon an incorrect representation of the Vocational Expert's testimony.

The ALJ's misrepresentation of the Vocational Expert's testimony is not the only error which occurred. The ALJ also relied upon the existence of a position not recognized by the DOT. In addition to housekeeper work, the ALJ cites the

-20-

existence of 1,500 "Security Monitor" jobs in the local economy to establish that significant work exists which Jefferson can perform. His reliance is problematic because the DOT does not include a listing for "Security Monitor." *See* Dictionary of Occupational Titles, Occupational Information Network, www.occupationalinfo.org (last visited July 22, 2010). Again, the Vocational Expert may simply have misstated a job title that is recognized by the DOT. However, the court cannot merely assume that the Vocational Expert meant to testify to information that is consistent with the DOT when his actual testimony was inconsistent with the publication. Further, the ALJ never elicited an explanation to resolve the discrepancy. The ALJ concluded that Jefferson is not disabled because jobs exist in significant numbers in the state that Jefferson can perform. However, the ALJ's determination relied upon both a misrepresentation of the Vocational Expert's testimony and the existence of jobs in a position not recognized by the DOT. Therefore, the court cannot find the ALJ's conclusion supported by substantial evidence.[2]

---

[2]Jefferson also argued that the ALJ erred by citing "Information Clerk" positions to establish that significant jobs exist in the local economy that Jefferson can perform. However, the ALJ's reliance upon the Vocational Expert's testimony that "Information Clerk" positions exist does not constitute error. The Vocational Expert testified that an individual with Jefferson's limitations could perform work as an "information clerk such as in a hospital, a mall." (Tr. 30). Unlike the "Security Monitor" positions noted above, the "Information Clerk" position *does* appear in the DOT. Jefferson's assertion of error arises from the examples the Vocational Expert provided of places where an information clerk may work. Jefferson argues that the Vocational Expert's testimony is inconsistent with the DOT because the "Information Clerk" position does not have an industry designation for medical services or retail trade and, therefore, the cited Information Clerk position does not exist in a "hospital or mall." However, the Vocational Expert did not state that the hypothetical individual presented by the ALJ could *only* perform "Information Clerk" jobs located in hospitals or malls. He simply gave those locations as examples, stating that such an individual could work as an Information Clerk in a setting "such as" a hospital or mall. The Vocational Expert did not foreclose the ability of an individual with Jefferson's limitations to perform an information clerk job in a different setting.

-21-

Accordingly,

**IT IS ORDERED** that the plaintiff's motions for leave to file excess pages (Docket ##12 and 20) be and the same are hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the decision of the Commissioner denying the plaintiff's application for Supplemental Security Income benefits be and the same is hereby **VACATED** and the plaintiff's application for benefits is **REMANDED** for further proceedings consistent with this opinion.

The clerk is ordered to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 3rd day of August, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-22-